# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

ATLANTIC GREEN SEA TURTLE,
LEATHERBACK SEA TURTLE,
LOGGERHEAD TURTLE,
KEMP'S RIDLEY SEA TURTLE,
PIPING PLOVER,
SHIRLEY A. REYNOLDS,
ROBERT H. GODWIN,

                         **Plaintiffs,**

-vs-                                    **Case No.  6:04-cv-1576-Orl-31KRS**

COUNTY COUNCIL OF VOLUSIA
COUNTY FLORIDA,
UNITED STATES FISH AND WILDLIFE
SERVICE, STEVEN A. WILLIAMS,
UNITED STATES DEPARTMENT OF
THE INTERIOR, GALE A. NORTON,
                         **Defendants.**
_____

## *AMENDED ORDER

This case is before the Court on the following motions and oppositions:

•       Defendant County Council of Volusia County, Florida's ("County") Motion to Dismiss

        (Doc. 48), and Plaintiffs' Opposition (Doc. 55) thereto; and

•       Defendants U.S. Fish and Wildlife Service's and Director Steven A. William's ("Service")

        and U.S. Department of the Interior's and Secretary Gale A. Norton's ("Secretary")[1]

        Motion to Stay (Doc. 61) and Plaintiffs' Opposition (Doc. 63) thereto.

_____

        [1]The U.S. Fish and Wildlife Service is a subdivision of the U.S. Department of the Interior, and the related defendants are Interior Department officials.  For ease of reference, the Court will identify these federal defendants as the Service or the Secretary as appropriate to context.

The Court held a hearing in regard to the Motion to Dismiss on February 16, 2005.  The Service

subsequently filed the Motion to Stay, after asserting at the hearing that a stay of these proceedings

is warranted.

## I.     INTRODUCTION

Congress enacted the Endangered Species Act of 1973, 16 U.S.C. §§ 1531 *et seq*. ("ESA"),

"to provide a means whereby the ecosystems upon which endangered species and threatened

species depend may be conserved, to provide a program for the conservation of such endangered

species and threatened species, and to take steps as may be appropriate to achieve the purposes of

[certain treaties]."  16 U.S.C. § 1531(b).  As part of a framework to accomplish these purposes, the

ESA requires the Secretary to make an official list of species that are "threatened" or "endangered"

("listed species") and designate their "critical habitat."  *Id*. § 1533.  The ESA contemplates that

these listed species will be "conserved," by "the use of all methods and procedures which are

necessary to bring [such species] to point at which [the ESA's species recovery measures] are no

longer necessary." *id*. § 1532(3).  One such recovery measure is the ESA's prohibition against

anyone "taking"[2] members of a listed species, except according to a permit or exemption issued by

the Secretary.  *Id*. § 1538 (a)(1)(B).

Plaintiffs ("Conservationists") Shirley Reynolds and Robert Godwin have filed the instant

case on their own behalf as well as in the names of several listed species – four sea-turtle and one

bird species.  The Conservationists seek to enjoin the County from allowing certain recreational

---

[2]The ESA defines the term "take" to mean: "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  Federal regulations further define certain of these sub-terms.  *See* 50 C.F.R. § 17.3.

activities on public beaches and to compel the Service to enforce the ESA and another federal law, so as to end the challenged activities.  The Conservationists contend, in essence, that the County and the Service are not doing what is "necessary" for the species to recover from listed status.

## II.   BACKGROUND

### A.   Early ESA Enforcement and the First Private-Party Claims

Summarized here very briefly are some highlights in the considerable history of conservation and ESA enforcement issues in this dispute.  In the early 1990s, the Service contacted the County with concerns about the threats to nesting sea turtles posed by the County allowing vehicular traffic on certain beaches.  (Doc. 49, Ex. 3, at 1).  The County thereafter attempted to mitigate the threat by establishing conservation zones and limiting the hours of vehicular access to the beaches.  The Service called for additional safeguards, and toward the mid-1990's, the Service worked with the County to develop a sea turtle protection plan and to establish proper safeguards to protect sea turtles from harmful human contact.

On June 8, 1995, Plaintiffs Shirley Reynolds, Loggerhead sea turtle (*Caretta caretta*), Leatherback sea turtle (*Dermochelys coriacea*), and Atlantic Green sea turtle (*Chelonia mydas*) filed suit in this federal district against the County and the Service.  *Loggerhead Turtle v. County Council of Volusia County, Florida*, Case No. 95-cv-587-ORL-22.  ("*Loggerhead*").  Plaintiffs' claims in *Loggerhead* centered around County ordinances, which permitted vehicular access on public beaches and certain artificial lighting in beach zones – activities alleged to "take" sea turtle species in violation of the ESA.

Soon after *Loggerhead* was filed, the County applied to the Service for an Incidental Take Permit (as contemplated by 16 U.S.C. § 1539(a)), to allow limited vehicular access, among other activities, on County beaches.  The application sought authorization for the "take" of various listed species – certain sea-turtle species; a bird species, the piping plover (*Charadrius melodus*); and certain plant species.  As part of the application review process, the Service undertook agency consultation within the U.S. Department of the Interior and received an official evaluation of the proposed activities' potential impact on listed species.  The official evaluation identified the listed species in the area, indicated that the area did not include a critical habitat, and made, in part, the following findings:

> 1.  Loggerhead sea turtle, green sea turtle, leatherback sea turtle, hawksbill sea turtle, Kemp's ridley sea turtle: As a result of the proposed action, several types of incidental take are anticipated to sea turtles . . . .
>
> 3.  Piping plover: [the County's public beaches] contain[] habitat known to be utilized as wintering habitat by the piping plover.  However, no vehicles are permitted in the area known to be occupied by this species; therefore, no incidental take is anticipated for piping plovers.

(Doc. 49, Ex. 2).  On November 21, 1996, the Service issued the County an Incidental Take Permit ("1996 Permit"), conditioned on various efforts and safeguards to mitigate the potential to "take" listed species.  (*See id.*, Ex. 3).  The Permit covered the sea turtle species at issue, but excluded the piping plover as unnecessary, given that no take of them was anticipated.  The 1996 Permit was issued for a 5-year period, scheduled to end on December 31, 2001, but subject to renewal.

The *Loggerhead* litigation thereafter continued and expanded; plaintiffs in the case filed amended claims alleging that the County was violating the 1996 Permit and that the Service improperly issued and administered the 1996 Permit.  The case, however, was eventually resolved

against the plaintiffs.  *See Loggerhead*, 92 F. Supp. 2d 1296, 1298-1300, 1308-09 (M.D. Fla. 2000) (detailing the case history and granting summary judgment on the claim challenging the County's artificial-lighting ordinance); *Loggerhead*, 120 F. Supp. 2d 1005 (M.D. Fla. 2000) (detailing the case history and granting summary judgment on the remaining claims).  The Court, in its final judgment in *Loggerhead*, concluded:

> Clearly the Plaintiffs are dissatisfied with the [1996 Permit's] issuance and its subsequent administration.  It is equally obvious from their papers that Plaintiffs wish to substitute their judgment for the Service's.  Neither the Court nor the Plaintiffs may do so under the APA.  The voluminous administrative record contains the requisite support for the Service's decisions to approve Volusia County's Habitat Conservation Plan and grant the [1996 Permit], and its refusal to revoke the [1996] Permit or to reinstate consultation.  Plaintiffs fail to demonstrate that any of the Secretary's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

*Loggerhead*, 120 F. Supp. 2d at 1026.  This effectively brought the matter to a close in regard to the County's ESA compliance, until after the 1996 Permit's scheduled expiration date.

### B.   Events In Regard to the Expiration, Continuance, and Potential Renewal of the 1996 Permit[3]

On October 19, 2001, the County sent the Service a letter ("Renewal Request") indicating that the 1996 Permit was set to expire December 31, 2001 and formally requesting that it be renewed for a 25-year period.  (Doc. 1, Ex. 5).  Among other things, the Renewal Request referenced the County's original permit application as being accurate (with one minor correction); stated that the County had fully implemented a Habitat Conservation Plan ("HCP") and that it was demonstrably effective, as shown by data collected in the years since the 1996 Permit was issued;

---

[3]Unless otherwise designated in context, the dates and events in this subsection have been gleaned from the Conservationists' Amended Complaint (Doc. 44).

and stated that the County was in the process of revising the HCP to address post-permit changes, observations, and developments. The County also expressed its understanding that the Renewal Request would initiate the permit renewal process and that the 1996 Permit would remain in effect until the Service made a final determination as to permit renewal. The County later submitted its updated HCP to the Service.

Since the 1996 Permit's originally scheduled expiration date, the Service has acted in regard to the Permit on several occasions. On January 24, 2003, the Service added a provision to the Permit allowing temporary access to the beach for certain construction or repair work and purported to extend the Permit's expiration date to March 31, 2003. Subsequent amendments have temporarily permitted similar activities and further purported to extend the Permit's expiration date up to April 30, 2005. In the interim, the Service's local field office transmitted the County's updated HCP as well as an updated incidental-take-permit application to the Service's regional (Atlanta) office on June 11, 2003. In the letter of transmittal, the Service's local field office said that it had reviewed the documents, believed them to be complete, and was forwarding the permit-renewal request for consideration by the Service's regional office. By all accounts, the Service considers the 1996 Permit to remain in effect pending a final permit decision.

### C.     The Current Private-Party (Conservationist's) Claims

On October 25, 2004, with reference to various developments and claiming that environmental effects of the 2004 hurricane season have changed the calculus for assessing the County's ESA compliance, the Conservationists filed the instant case. As it stands, the Conservationists assert six counts summarized as follows:

- Count I is a request for declaratory judgment that the County is liable for the "take" of threatened piping plovers by allowing pet dogs and vehicular traffic on public beaches.

- Count II is a request for declaratory judgment that the County failed timely or properly to file for renewal of the 1996 Permit; it, therefore, expired; and the County is, accordingly, liable for the "take" of listed sea turtles by permitting various beach activities.

- Count III is a claim that, in violation of Administrative Procedures Act, the Service acted arbitrarily, capriciously, and unlawfully by accepting, as timely, the County's renewal application, by amending the 1996 Permit and extending its expiration date, and by failing to act on the renewal application within a reasonable amount of time.

- Count IV is a claim that, in violation of the National Environmental Policy Act, the Service has acted unlawfully by failing to publish certain notices and by failing to undertake an official Environmental Assessment of the impact of the 1996 Permit's extension, amendments, and renewal.

- Count V, as an alternative to Counts II, III, and IV, is a claim that the County has violated the 1996 Permit (as extended) and that the violations have caused a "take" of sea turtles in violation of the ESA and related regulations.

- Count VI, as an alternative to Counts II, III, and IV, is a claim that the Service has found the County in violation of the 1996 Permit, but has failed timely and appropriately to revoke the 1996 Permit.

Based on these counts, the Conservationists seek injunctive relief requiring: (1) the cessation of vehicular traffic, concessions, mechanical raking, and other activities allowed under the County's beach-related ordinances; (2) the Service to publish, in the Federal Register, various notices,

-7-

including a notice of receiving the County's permit application; (3) the Service to prepare an

official Environment Assessment of the impacts of the 1996 Permit's continuance, amendments,

and renewal; and (4) the Service to revoke the 1996 Permit (as  extended).

> **D.    The Conservationists' Request for Preliminary Injunctive Relief**
> **        for the Piping Plover in the Instant Case**

Near the outset of the instant case, the Conservationists filed a Motion for Preliminary

Injunction (Doc. 26), seeking to enjoin the County from allowing any vehicular traffic, during the

piping plovers' overwintering season, in an area of public beach designated as a "critical habitat"

for the species.  It was established, in the course of resolving the Motion, that the piping plovers'

overwintering season in Florida lasts from September through April each year.

The Court denied the Motion because the Conservationists failed to establish a reasonable

likelihood that, if allowed to continue, the vehicular traffic at issue would "take" piping plovers in

violation of the ESA.  The Court did not foreclose the possibility that the Conservationists might

later prove a "take" of piping plovers.  In effect, however, as the season has passed, injunctive

relief would not be available for the piping plover until September 2005 at the earliest.

> **E.    The Defendants' Requests to Dismiss or (Otherwise) to Stay**
> **        the Instant Case**

The County points out that most of the Conservationists' claims turn on whether the

Service has appropriately issued, administered, or amended the 1996 Permit.  The County seeks

dismissal of such claims on ground that the Service's actions in this case are non-reviewable.  To

the claim that the 1996 Permit has expired, the County points to the absence of contrary legal

limitations as proof that permit extension is within the Service's unreviewable discretion.  To the

claims that the Service has improperly handled amendments to the 1996 Permit and consideration

of whether to renew the Permit, the County contends that the decisions involved are either committed to the Service's unreviewable discretion or are not final actions susceptible to judicial review.  Finally, to the claims that the County has violated the 1996 Permit and the Service must revoke the Permit, the County contends that the Conservationists have adequate alternative remedies to judicial review and the Service's permit-enforcement decisions are also committed to the Service's unreviewable discretion.

The County contends, furthermore, that the Court should defer to the Service's primary jurisdiction.  The County points out that its pending application for renewal of the 1996 Permit applies to all the species in this case.  The Service, according to the County, has the requisite expertise and is better suited to determine whether the Defendants are doing what is "necessary" to conserve the species at issue.

The Service, for its part, requests a stay of this proceeding until it determines whether to grant or deny the County's permit-renewal application.  The Service points out that, since the filing of this case, the Service has published a Federal Register notice, which (1) announces that the permit-renewal application was filed, (2) provides a public comment period for the HCP and a draft Environmental Assessment, and (3) states the Service's preliminary conclusion that permit renewal is not a major federal action subject to NEPA's requirements.  The Service contends that, in reaching a final decision whether to renew the 1996 Permit and extend it to the piping plover, it must consider all available biological data as well as the changed circumstances mentioned by the Conservationists.  To the prospect of judicial review, the Service urges that, if the Court does not grant the County's Motion to Dismiss, the Court should stay this case until the Service has rendered its final determination, an event forecast to occur in September 2005.

### III.    STANDARD OF REVIEW

Jurisdictional motions to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(1) come in two forms that may involve substantially different standards of review.  First, there are "facial attacks," which "require the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction . . . ."  *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990).  As is generally the standard for Rule 12(b)(6) motions to dismiss, a court assessing a "facial attack" on jurisdiction is to assume the allegations in the complaint are true and not look outside the pleadings and attached exhibits.  *See id.*  Second, there are "factual attacks," which challenge the factual basis asserted for jurisdiction.  *Id.*  If a factual attack on jurisdiction regards an issue reasonably distinct from the merits, the court may weigh conflicting written and oral evidence and decide for itself whether jurisdiction exists.  *See, e.g. Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 512-13 (5th Cir. 1980) (affirming Rule 12(b)(1) dismissal where evidence outside the pleadings revealed a lack of state action and thus no jurisdictional basis for a civil rights claim).  Nevertheless, in regard to motions to dismiss, judicial economy and fairness require a defendant to proceed under Rule 12(b)(6) when challenging the merits of a plaintiff's claim.  *Lawrence*, 919 F.2d at 1529.

In ruling on a 12(b)(6) motion to dismiss for failure to state a claim, a court must view a complaint in the light most favorable to the plaintiff, *Scheuer v. Rhodes*, 416 U.S. 232 (1974), and must limit its consideration to the pleadings and any exhibits attached thereto.  FED.R.CIV.P. 10(c). *See also GSW, Inc. v. Long County, Ga.*, 999 F.2d 1508, 1510 (11th Cir. 1993).  A court is to assume that the allegations are true and liberally construe them in the plaintiff's favor.  *Jenkins v. McKeithen,* 395 U.S. 411, 421 (1969).  Dismissal for failure to state a claim is not appropriate

unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  If, however, no construction of the factual allegations will support a cause of action in light of a dispositive issue of law, a court may dismiss a legally insupportable claim for relief.  *See Marshall County Bd. of Educ. v. Marshall County Gas Dist.*, 992 F.2d 1171, 1175 (11th Cir. 1993).

## IV.     LEGAL ANALYSIS

As previously indicated, the ESA requires the Secretary to list "threatened" and "endangered" species and to designate their "critical habitat," 16 U.S.C. § 1533, and the ESA contemplates the "use of all methods and procedures which are necessary to bring [listed species] to the point at which [the ESA's species recovery measures] are no longer necessary." *id.* § 1532(3).

Although it is generally unlawful under the ESA to "take" listed species, *id.* § 1538(a)(1)(B), the ESA authorizes the Secretary to "permit, under such terms and conditions as he shall prescribe, any [such] taking . . . if [it] is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity," *id.* § 1539(a)(1)(B).  This authority is not without certain limits. No such permit may be issued unless an applicant submits a habitat conservation plan meeting certain criteria.  *Id*. § 1539(a)(2)(A).  And a permit cannot be issued unless the Secretary finds, among other things, that mitigation measures included in the plan will minimize the impact of takings and "the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild."  *Id*. § 1539(a)(2)(B).  If these and similar pre-conditions are met, the Secretary must issue an incidental take permit.  *Id.*  A permit so issued is to contain "such terms and conditions as the Secretary deems necessary or appropriate [to ensure the efficacy of "take"

mitigation measures] including, but not limited to, such reporting requirements as the Secretary deems necessary for determining whether such terms and conditions are being complied with." *Id*. The Secretary thereafter is to revoke a permit, "if [she] finds that the permittee is not complying with [its] terms and conditions . . . ." *Id.* § 1539(a)(2)(C).

The ESA includes a further general requirement that the Secretary enforce the ESA's provisions and any regulations or permits issued according to its provisions. *Id.* § 1540(e). In that regard, the ESA authorizes "[t]he Secretary . . . to promulgate such regulations as may be appropriate to enforce [the ESA]." *Id.* § 1540(f).

Notwithstanding the Secretary's official enforcement, the ESA also provides for enforcement by private citizens. *See generally* 16 U.S.C. § 1540(g). In relevant part, the ESA's "citizen suits" provision authorizes "any person [to] commence a civil suit on his own behalf to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of [the ESA] or regulation issued under authority thereof." *Id.* § 1540(g)(1)(A). As to affirmative violations of the ESA, such as unauthorized "takes," the ESA explicitly provides for injunctive relief. *Id*. Yet, with an exception not relevant here,[4] the ESA does not, in itself, provide for judicial review of the Secretary's administration of the ESA. *Bennett v. Spear*, 520 U.S. 154, 174 (1997). Judicial review of such administrative conduct may occur, if at all, according to the judicial review provisions of the Administrative Procedures Act, 5 U.S.C. § 701 *et seq*. ("APA"). *See id.*

---

[4] The ESA provides its own standard for judicial review of whether the Secretary has complied with 16 U.S.C. § 1533; to wit, "any person may commence a civil suit on his own behalf against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 1533 of this title which is not discretionary with the Secretary." 16 U.S.C. § 1640(g)(1)(C); *Bennett v. Spear*, 520 U.S. 154, 171 (1997). The Conservationists do not allege a violation of that section.

Along related (but more general) statutory lines, the National Environment Policy Act, 42

U.S.C. § 4331 *et seq*. ("NEPA"), mandates "that federal agencies consider the environmental

impact, and potential alternatives, for every proposed 'major Federal action significantly affecting

the quality of the human environment.'" *Sierra Club v. U.S. Army Corps of Eng'rs.*, 295 F.3d

1209, 1214 (11th Cir. 2002) (citing 42 U.S.C. § 4332(2)(C)).  According to regulations

implementing this general mandate, *see* 40 C.F.R. § 1500 *et seq*., an agency is to identify, at the

outset, whether a proposed agency action is one that might trigger NEPA obligations.  Subject to

certain exclusions, agencies are to use a document called an environmental assessment ("EA") to

identify whether further NEPA-related review is necessary.  40 C.F.R. §§ 1501.2, 1501.3(a),

1504(c).  As with issues of an agency's ESA administration, NEPA does not provide its own

means for judicial review of such administrative conduct; judicial review may occur, if at all, only

in accordance with the APA.  *Sierra Club*, 295 F.3d at 1214.

Against this backdrop, the instant case involves a series of disputed issues about the

availability (and, if available, the appropriate timing) of judicial review and remedies.  As to the

Conservationists' first Count, the dispute regards an alleged affirmative ESA violation: that the

County has "taken" piping plovers without an incidental take permit.  At issue in that regard is the

availability and timing of judicial remedies under the ESA.  *See* 16 U.S.C. § 1540(g)(1)(A).  As to

the remaining bulk of the Counts, the dispute primarily involves the Secretary's alleged failures to

enforce the ESA appropriately and to comply with the NEPA appropriately.  At issue in that regard

is the availability and timing of judicial remedies under the APA.  *See* 5 U.S.C. §§ 701, 704;

*Bennett*, 520 U.S. at 174.  The Court will first consider the bulk of the Counts, which involve the

more legally complex issues of APA review.

### A.    APA Review and the Conservationists' Claims of Inappropriate ESA Enforcement and NEPA Compliance

The APA is a means for judicial review of all "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704, "except to the extent that (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law," *id.* § 701(a).  If an agency action is "final" and if "there is no other adequate remedy" and if the foregoing exceptions do not apply, the APA provides the following relevant "scope of review":

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret . . . statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall –
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be –
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . .

*Id*. § 706.

In regard to the Service's administration of law, the parties dispute whether certain conduct constitutes "final agency action"; whether, for certain alleged ESA violations, there are adequate alternative remedies besides judicial review under the APA; and whether certain agency actions are committed to agency discretion by law.  The Court will analyze these issues, and the timing of potential remedies, beginning from the conduct the Conservationists challenge.

### 1.    Continuance of the 1996 Permit

The Conservationists challenge the continuance of the 1996 Permit as an unacceptable *status quo*.  They allege, in Count II, that the County failed to make a timely and sufficient application to renew the Permit.  They further allege, in Count III, that the Service has unlawfully

caused the Permit to remain in effect by amending it and by failing to render a formal decision on whether to renew it.  Both these claims concern basic permit-renewal procedures.

As to permit application in general, the ESA's terms provide only that the Secretary cannot issue an incidental take permit "unless the applicant therefor submits to the Secretary a [habitat] conservation plan that specifies . . . ." certain substantive information.  16 U.S.C. § 1539(a)(2)(A).  It is clear from this language that an applicant cannot <u>initially</u> receive a permit before filing a habitat conservation plan, but the language does not so much as suggest content or procedural requirements for initial permit or renewal applications.  That is left to the Secretary.

### a.   Automatic Continuance of Permit

The Service has promulgated general application procedures under the Secretary's authority.  "Applications must be submitted in writing on a Federal Fish and Wildlife License/Permit Application (Form 3-200) *or as otherwise specifically directed by the Service*." 50 C.F.R. § 13.11(a)(emphasis added).  But applicants generally need not submit separate applications for each permit.  *Id.* § 13.11.  The Service has prepared a handbook on permit processing, which provides the following in regard to permit renewal:

> If the permittee files a renewal request and the request is on file with the issuing FWS office at least 30 days prior to the permit's expiration, the permit will remain valid while the renewal is being processed, provided the existing permit is renewable.  The permittee may <u>not</u> take listed species beyond the quantity authorized by the original permit, however.  A renewal request must:
>
> - Be in writing;
>
> - Reference the permit number;
>
> - Certify that all statements and information in the original application are still correct or include a list of changes;

    ○        Provide specific information concerning what take has occurred under the existing permit and what portions of the project are still to be completed; and

    ○        Request renewal.

U.S. DEP'T OF INTERIOR, FISH AND WILDLIFE SERVICE, HABITAT CONSERVATION PLANNING AND INCIDENTAL TAKE PERMIT PROCESSING HANDBOOK, 6-28 - 6-29 (1996) ("Permit Handbook"). As indicated therein and consistent with general license renewal procedures, proper renewal requests cause a renewable permit to remain in effect until the Service renders its final determination. 5 U.S.C. § 558(c) (providing for the continuance of naturally ongoing activity during period between license renewal request and final agency determination); 50 C.F.R. § 1322(c) (providing the same in regard to incidental take permits).

      The Conservationist argue that the County failed to file a proper renewal request. Specifically, they argue that, according to 50 C.F.R. § 13.22, a renewal request is invalid unless an applicant makes a specific-form certification stating that all information in the original application remains current and correct.[5] They claim, furthermore, that the County failed to do this. In this regard, however, the Conservationists overlook the Permit Handbook and incorrectly assume that the Service's acceptance of a renewal request is a final agency action.

_____

[5]50 C.F.R. § 13.22(a) calls for renewal applicants to make the following form certification under 50 C.F.R. § 1312(a)(1)(5):

> I hereby certify that I have read and am familiar with the regulations contained in [certain  parts of] title 50 . . . of the Code of Federal Regulations . . . and I further certify that the information submitted in this application for a permit is complete and accurate to the best of my knowledge and belief. I understand that any false statement herein may subject me to suspension or revocation of this permit and to the criminal penalties of 18 U.S.C. 1001.

The Service publishes official forms for the convenience of incidental-take-permit applicants.  *See, e.g.*, Federal Fish and Wildlife Permit Application Form 3-200-56, *available at* http://www.fws.gov/permits/applicationforms/ApplicationE.shtml#esa.  Those forms include the specific-form certification referenced in 50 C.F.R. § 13.22, and, were it not for the Permit Handbook, such formalistic requirements might seem relevant.  Nevertheless, the general application procedures under 50 C.F.R. § 13.11(a) call for applications to be submitted in such a form "**or** as otherwise specifically directed by the Service." (emphasis added).  The Permit Handbook provides the less formal, but clearly reasonable, renewal-request requirements quoted above.  The County complied with the Permit Handbook and, therefore, appropriately filed its Renewal Request.  (*See* Doc. 1, Ex. 9)

With that, the Renewal Request automatically caused the 1996 Permit to remain in effect until the Service's final determination.  *See* 5 U.S.C. § 558(c); 50 C.F.R. § 13.22(c).  Accordingly, the Service's acceptance of the Renewal Request, and the resulting continuance, occurred as a matter of course and procedure that did not involve or require contemporaneous agency action in any real sense.

More importantly, a *sine qua non* of APA review is "final agency action," not simply any of the myriad steps involved in evaluating whether to undertake or approve a final agency action.  5 U.S.C. § 704.  In *Bennett v. Spear*, the Supreme Court set forth the following test for "final agency action":

> As a general matter, two conditions must be satisfied for agency action to be "final": First, the action must mark the "consummation" of the agency's decisionmaking process – it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow."

520 U.S. 154, 177-78 (1997) (citations omitted).

Applications, by their nature, contemplate further action.  Refusal to accept one for review might constitute final action.  Otherwise, however, applications generally mark the inception of an evaluation process or, as in the instant case, a re-evaluation process.  To review an application's substantive merits simply does not mark the "consummation" of the decisionmaking process.  Accordingly, there is no doubt that the Conservationist's challenge to the 1996 Permit's automatic continuance is not subject to judicial review under the APA.  *See id.*

b.      **Length of Renewal Review**

Although it is clear that, by reason of the Renewal Request, the 1996 Permit continued in effect after December 31, 2001, the Conservationists contend that over time the Service's failure to render a final determination has become a "final agency action" subject to APA review.  To this end, the Conservationists cite the following passage from *National Parks Conservation Ass'n. v. Norton*, 324 F.3d 1229, 1239 (11th Cir. 2003):

> We agree, as a general matter, that an administrative agency cannot legitimately evade judicial review forever by continually postponing any consequence-laden action and then challenging federal jurisdiction on "final agency action" grounds. *See, e.g., Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C.Cir.2001) ("As this court has noted in the past, where an agency is under an unequivocal statutory duty to act, failure so to act constitutes, in effect, an affirmative act that triggers 'final agency action' review. Were it otherwise, agencies could effectively prevent judicial review of their policy determinations by simply refusing to take final action.") (citations and internal punctuation omitted); *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C.Cir.1987) (noting that to deem unreviewable an agency's withholding of action that would be reviewable under the APA could be to permit the agency to "forever evade our review").

While this Court might be compelled by law and logic to agree with that general proposition, *Norton* is distinguishable and does not aid the Conservationists' claims.  *See id.* at 1232-33 (finding no "final agency action" as to a claim that at least two years of federal agency inaction had

essentially granted private land leases in contravention of clear language in expired and unrenewable leases); *see also Cobell*, 240 F.3d at 1095 (involving claims of unreasonably delay by trust beneficiaries to whom the federal government owed, but failed for decades to fulfill, clear duties as trustee).

As a foil to agency inaction and the specter of unaccountability, the APA provides that, if certain prerequisites are met, "a reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed . . . ." 5 U.S.C. § 706(1). The general proposition, expressed but found inapplicable in *Norton*, addresses the prerequisite of "final agency action." *See id.* § 704. As indicated, courts generally view that prerequisite broadly, because agency inaction amassing the consequences of a "final agency action" could otherwise evade review. Another prerequisite to APA review is that there must be an appropriate legal basis on which to judge agency action; if "agency action is committed to agency discretion by law," review is unavailable under the APA. *Id.* § 701(a)(2). Courts generally read this prerequisite narrowly, so as not to preclude judicial review where an agency is failing to carry out reasonably ascertainable legal duties that Congress has not left to agency discretion. *See Heckler v. Chaney*, 470 U.S. 821, 830-31 (1985).

The Conservationists, in reliance on the interpretive bent favoring APA review, argue that they have alleged a viable claim for certain relief under the APA. In essence, they argue that the Service has finally settled upon a course of unreasonable delay, establishing legal consequences, in a manner inconsistent with reasonably ascertainable and mandatory legal duties. Whether that is so depends, of course, on the ESA and the Service's administration of the ESA.

The ESA provides, in part, the following with regard to the Service's handling of incidental take permits and related applications:

- "The Secretary *may* permit, *under such terms and conditions as he shall prescribe*[,] any [incidental] taking . . . ." 16 U.S.C. § 1539(a)(1)(B) (emphasis added).

- "No [incidental take] permit may be issued by the Secretary . . . unless the applicant therefor submits to the Secretary a conservation plan that specifies [certain information]." *Id*. § 1539(a)(2)(A).

- "If the Secretary finds, after opportunity for public comment, with respect to a permit application and the related conservation plan that–

  > (i) the taking will be incidental;
  > (ii) the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking;
  > (iii) the applicant will ensure that adequate funding for the plan will be provided;
  > (iv) the taking will not appreciably reduce the likelihood of survival and recovery of the species in the wild; and
  > (v) the measures, if any, [that the Secretary required as necessary or appropriate to the conservation plan] will be met;

  and he has received such other assurances as he may require that the plan will be implemented, the Secretary *shall* issue the permit.  The permit *shall* contain such terms and conditions as the Secretary deems necessary or appropriate to carry out the purposes of this paragraph . . . ." *Id.* § 1539(a)(2)(B) (emphasis added).

It is evident that these provisions charge the Secretary with the potentially formidable responsibility of determining complex, fact-intensive issues that require systemic and systematic analysis.  And if the Secretary ultimately finds that particular criteria are met, the Secretary is obligated to issue the permit.  *Id.*

The history of the instant dispute conclusively reveals that the Secretary undertook such analysis (with regard to the sea-turtle species and locations at issue in this case) and properly issued the 1996 Permit.  *Loggerhead*, 120 F. Supp. 2d at 1022.  Based on that analysis, the Secretary made the 1996 Permit renewable but scheduled December 31, 2001 as its expiration

date.  As such, the Secretary cannot be said to have found it necessary for the permitted activities

to cease on December 31, 2001; the filing of a renewal request clearly would hold the expiration in

abeyance.  *See* 50 C.F.R. § 13.22.  It is fair to say, however, the Service envisioned that a re-

evaluation of the 1996 Permit would be appropriate after five years, that is, after December 31,

2001.  When the time came, the County had submitted its Renewal Request, along with

information concerning what "take" had occurred under the 1996 Permit.

In the nearly 3 years and 4 months since then, various things have occurred.  The County

has submitted an updated HCP to the Service and has asked the Service to expand incidental-take

authorization to cover another species, the piping plover.  The renewal request and related

information have been wending their through the Service's review process, as shown by the June

11, 2003 letter from the Service's local office to its regional office.  A damaging hurricane season

impacted the County's coast in 2004.  And throughout this period, and since August 9, 2001, an

area of the County's beaches has been designated as a "critical habitat" for the piping plover.

Accordingly, the Service has had before it a great deal of information and factors to consider as

well as levels of official review to complete.

On February 25, 2005, the Service published a notice in the Federal Register announcing

(1) the County's request to renew the 1996 Permit and amend it to cover the piping plover, (2) the

availability of the HPC and EA for review, (3) and an April 26, 2005 deadline for public

comments.  Through a senior official, the Service has submitted a sworn affidavit stating that it

anticipates completing the review process by September 2005.  (Doc. 32, Attach. 1).

The Court mentions this history and the foregoing circumstances as a basis for comparison.[6]  In *Norton*, for instance, over two years passed without a federal agency's final decision on what to do with certain structures on federal land.  324 F.3d at 1237-38.  In the meantime, the agency permitted former leaseholders to retain possession of the structures despite the expiration of leases, which "expressly provided that the lessees forfeited all rights to the buildings other than those provided for in the leases, and that the structures were to be removed by the lessor upon the leases' expiration."  *Id.* at 1232.  Although one could argue that the agency's failure to evict the former leaseholders gave rise (at least temporarily) to real property rights, the court found, based on various circumstances, "we cannot conclude that the [agency] has taken any final action or engaged in a pattern of inaction that can be said to 'mark the consummation of the agency's decisionmaking process' or to be 'one by which rights or obligations gave been determined,' or from which 'legal consequences will flow.'" *Id.* at 1238.  Content to allow further agency deliberations on a land management plan that would encompass the structures, the court found that it lacked jurisdiction to undertake APA review of the agency's conduct.  *Id.* at 1240.

To be sure, the timing and circumstances in the instant case differ from those in *Norton*.  As far as the potential for legal consequences, the instant case is more compelling; the 1996 Permit's terms availed the continuance and possible renewal of the permit, whereas the leases in *Norton* unambiguously contemplated cessation.  *Id.* at 1232.  And neither case reflects an agency's obvious failure to perform a clear duty that is easy to dispatch.  Indeed, although the Service has

---

[6]In considering certain information, which is not found in the Conservationists' pleadings, the Court is exercising its discretion to weigh evidence potentially bearing on the Court's jurisdiction. *See* discussion *supra* Part III.  Whether there is final agency action subject to APA review is a jurisdictional issue. *Norton*, 324 F.3d at 1240.

not rendered a final determination in a comparatively greater length of time, its deliberations appear more problematic.  Beyond having to take into account issues such as the environmental impact of last year's hurricane season, the basic balance of interests involves challenges the *Norton* did not.  The Service has a duty to the County; if the Secretary finds that certain criteria are met, "the Secretary shall issue a permit."  16 U.S.C. § 1539(a)(2)(b).  There was no such issue in *Norton* because the former leaseholders forfeited all interests in the structures.  *Norton*, 324 F.3d at 1232.  These factors, as well as the Service's assurances of an approaching determination, call for dismissal of the instant APA claim for lack of "final agency action" and thus lack of jurisdiction as was the case in *Norton*.  *See id.* at 1238-40.

Nevertheless, a further point appears worthy of discussion.  If the Court assumed that "unreasonable delay" gave rise to a "final agency action" in the instant case, little would change.  The APA's remedy for unreasonable delay is that "the reviewing court shall compel agency action unlawfully withheld or unreasonably delayed."  *See* 5 U.S.C. § 706(1).  For agency action, "the reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *See id.* at 706(2)(a).  For the Court to set aside the Service's conduct – presumably, a *de facto* permit renewal – the Court would have to find that, at some point after December 31, 2001, a critical threshold of circumstances was reached, such that a later *de facto* renewal was arbitrary or otherwise unlawful.[7]  *See id.*  One might argue, in logic followed to absurdity, that based on

---

[7]Herein lies a further point against finding "final agency action."  A sufficient amount of time would have to pass after the critical threshold was met before it could reasonably be found that the Service, through inaction, acted arbitrarily or in an otherwise unlawful manner.  *See id.*  For instance, one of the Conservationists' more prominent allegations is that beach erosion from the 2004 Hurricane season increased the threat certain activities pose to listed species.  The Service has had less than a year to ascertain the impact of that phenomenon in relation to various other considerations.

unreasonable delay in publishing certain notices, the Court could set aside a *de facto* permit renewal as procedurally inadequate.  The 1996 Permit, however, would continue in effect based on the Renewal Request, and the deeper substantive issue would remain.  Let this Court be the first to observe that no rapid resolution would be forthcoming on that difficult issue, even if it were properly before the Court today.  That issue is not so immediate, however.  Indeed, the deadline for dispositive motions is not until August 1, 2005, and it will be some time before the Conservationists could hope to prove such a claim or receive the relief they seek.

When the Service renders its official determination (around September 2005) an updated incidental take permit will be issued or denied, and a final agency assessment of the ESA's factors will be available for review, should either the Conservationists or the County seek it.  In addition, a great benefit will accrue in the form of a recent assessment of environmental and species-related issues that are well-beyond the Court's common experience.  As this benefit will outweigh the cost of delay, if any, the Court would readily defer the exercise of jurisdiction until then.  *See Smith v. GTE Corp.*, 236 F.3d 1292, 1298 n.3 (11th Cir. 2001)(recognizing that, under the doctrine of primary jurisdiction, a district court may dismiss or stay a claim pending the resolution of issues that, under a regulatory scheme, are within the special competence of an agency).

### 2.      Enforcement of the 1996 Permit

As an alternative attack on the 1996 Permit and the Service's administration of it, the Conservationists seek declaratory judgment that the County has violated, or is not complying with, the conditions of the 1996 Permit.  From that point, the Conservationists then seek an order compelling the Service to revoke the 1996 Permit or an order enjoining the County from allowing

the activities covered by the Permit.  At issue, in this regard, is a challenge to the adequacy of the Service's permit enforcement.

### a.        permit enforcement by the Conservationists

A preliminary point needs mention.  Count V of the Amended Complaint is purportedly a claim for violation of the ESA's "take" provision, 16 U.S.C. § 1538(a)(1)(B).  Specifically, the Conservationists claim that instances of noncompliance with the 1996 Permit's conditions exceed the Permit's conditional grant of "take" authorization and amount to an unlawful "take."

Liability under ESA section 1538(a)(1)(B) expressly requires section 1539 to be inapplicable: "[e]xcept as provided in section[] . . . 1539 of [the ESA] . . . it is unlawful for any person . . . to take [listed] species . . . ."  *Id*.  Section 1539 provides *inter alia* that "the Secretary may permit, *under such terms and conditions as he shall prescribe*, any taking otherwise prohibited by section 1538(a)(1)(B) . . . ."  *Id*. § 1539(a)(1)(B) (emphasis added).  Although, at first blush, it might appear plausible to read the terms-and-conditions clause as a limit beyond which section 1538(a)(1)(B) applies, that is not so.  Section 1539 sets forth an exception to section 1538(a)(1)(B) and contemplates a distinct enforcement mechanism that is not available to private citizens.  For conduct that violates the terms and conditions of an incidental take permit, the ESA contemplates one enforcer.

"The provisions of [the ESA] and any regulations or *permits* issued pursuant thereto shall be enforced by the Secretary."  *Id*. § 1540(e) (emphasis added).  As enforcement tools, the Secretary "may" assess a civil penalty up to $25,000 for each knowing violation, or up to $500 for each unintentional violation, of the ESA or a permit issued thereunder.  *Id*. § 1540(a).  In addition, "[t]he Secretary shall revoke a permit . . . if he finds that the permittee is not complying

with the terms and conditions of the permit." *Id*. § 1539(a)(2)(C). In comparison, the ESA's citizen suit provision provides, in relevant part, for suits to enjoin violations only of the ESA and related regulations. The ESA, itself, simply does not provide a private enforcement mechanism covering the terms and conditions of incidental take permits.[8]

### b. permit enforcement by the Service

While the Conservationists cannot directly pursue permit enforcement under the ESA, in Count VI, they alternatively seek APA review of the Service's alleged failure to enforce and revoke the 1996 Permit. The Conservationists, in this regard, rely on the ostensibly mandatory language: "[t]he Secretary *shall* revoke a permit . . . if he finds that the permittee is not complying with the terms and conditions of the permit." *Id*. § 1539(a)(2)(C) (emphasis added). The County, in response, points to the language's qualifying phase ("if he finds . . .") to argue that the Service's decision on whether to revoke a permit fits within the exception to the APA for agency actions committed to agency discretion by law. *See* 5 U.S.C. § 701(a)(2) (precluding review if "agency action is committed to agency discretion by law").

In *Heckler v. Chaney*, 470 U.S. 821, 828 (1985), the Supreme Court examined the committed-to-discretion exception. To avoid possible conflict with the abuse-of-discretion standard in APA § 706, the Court found the exception to mean that review is not available if a

---

[8]The Conservationists correctly point out that a regulation requires "[a]ny person holding a permit under [the ESA] and any person acting under authority of such permit [to] comply with all conditions of the permit and with all applicable laws and regulations governing the permitted activity." 50 C.F.R. § 13.48. That point is to no avail. No injunction would be available to enforce such a general requirement because it would require nothing less than the Court to police the County's permit compliance. The ESA places that duty exclusively on the Secretary. *Id*. § 1540(a), (e). Furthermore, it is the executive (not the judicial) branch that is generally charged with such duties. *See* U.S. CONST. Art. II § 3.

"statute is drawn so that a court would have no meaningful standard against which to judge the

agency's exercise of discretion." *Id*. at 830.  The Court, in that regard, identified refusals to

undertake enforcement action as a type of action presumptively committed to absolute agency

discretion. *Id.* at 831.  Figuring into this were practical considerations such as the inability of

agencies to act on every statutory violation and the notion that agencies are better equipped than

courts to know and allocate finite agency resources. *Id.* at 831-32.  The Court also observed that

enforcement decisions are akin to prosecutorial discretion, which fits in the special province of the

Executive to "take Care that the Laws be faithfully executed." *Id*. at 832 (citing U.S. Const. Art.

II, § 3).  The Court was careful to point out, however, that enforcement decisions are "only

presumptively unreviewable; the presumption may be rebutted where the substantive statute has

provided guidelines for the agency to follow in exercising its enforcement powers." *Id.* at 832-33.

In particular, "Congress may limit an agency's exercise of enforcement power if it wishes, either

by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate

among issues or cases it will pursue." *Id.* at 833.

     The Court, in *Heckler*, gave the following statutory language as an example of Congress

withdrawing agency discretion and providing guidelines for the exercise of enforcement power:

"upon filing of a complaint by [an aggrieved person], the Secretary shall investigate such

complaint and, if he finds probable cause to believe that a violation has occurred he shall bring a

civil action." *Id*. at 833-34 (internal marks omitted) (citing 29 U.S.C. § 482).  In comparison, the

Court was not swayed by general language stating that any person who violates a criminal

provision "shall be imprisoned or . . . fined." *Id*. at 825.[9]  The Court, moreover, refused to infer a

requirement that the agency recommend "major" violations for criminal prosecution based on

statutory language disavowing such a requirement for "minor" violations; the language only

applied to violations already established to the satisfaction of the agency; and it did not "speak[] to

the criteria which shall be used by the agency for investigating *possible* violations of the Act."  *Id*.

at 837 (emphasis in original).  The Court, therefore, concluded the that statute's provisions did not

overcome the presumption that agency enforcement decisions are committed to agency discretion

by law.  *Id*. at 837-38.

     In the instant case, the Conservationists and the County both heavily rely on different

clauses of the provision: "The Secretary shall revoke a permit if he finds that the permittee is not

complying with the terms and conditions of the permit." 16 U.S.C. § 1539(a)(2)(C).  "Shall" marks

a mandate, as the Conservationists contend.  But, as the County contends, the conditional "if"

presupposes enforcement discretion.  The basic question, however, is whether the ESA dictates

criteria or guidelines for the Service to follow in deciding when and how to exercise enforcement

powers.  *Heckler*, 470 U.S. at 831-33.

     As a general matter, the ESA's "penalties and enforcement" section provides that "[t]he

provisions of [the ESA] and any regulations or permits issues pursuant thereto shall be enforced by

the Secretary."  16 U.S.C. § 1540(e).  This, however, plainly does not mandate an impossibility –

*i.e.*, the Service to pursue to the fullest each and every possible violation of the ESA or permits

---

     [9]A basic problem, the Court observed, is that the Secretary was only in a position to recommend prosecution, which was to be pursued, if at all, by the Attorney General.  Nevertheless, the Court first observed that common "shall be punished" language does not indicate Congress' intention to mandate the criminal prosecution of every violation.

thereunder.  Indeed, the ESA provides that the Secretary "may" assess civil penalties for such violations.  *Id*. § 1540(a).  Permit revocation, furthermore, is premised on "finding" that a permittee is in continuing noncompliance with the terms and conditions of a permit.  *Id*. § 1539(a)(2)(C).  This obviously requires something more than a discrete, past violation.  Together, these enforcement provisions contemplate that the Service will, at times, undertake investigations and determine compliance.  The provisions, nevertheless, do not provide criteria or guidelines charting a process the Service shall use to investigate possible noncompliance.  *See Heckler*, 470 U.S. at 837.  The how and when of enforcement investigations and deliberations is completely left to the Service.[10]

The Conservationists, to negate investigative and deliberative discretion, allege that the Service, despite its denials, has found the County in continuing noncompliance with the 1996 Permit.  That, however, merely glosses over an essential investigative predicate and the absence of a legal standard.  The ESA does not provide any judicially manageable standard to constrain the Service's deliberative, investigative discretion.  Absent such constraints in the ESA, when addressing the uncountable instances of possible noncompliance, the Service presumptively has unreviewable discretion, in various and sundry instances, not to undertake steps for finding noncompliance.  *See id.* at 831-33.  Under the APA, the Court cannot compel such steps because

---

[10]The ESA does not provide, for instance: upon receipt or discovery of information providing probable cause to believe that a permittee is in substantial non-compliance with the terms and conditions of a permit, the Secretary shall institute a full assessment of the permittee's compliance; and if substantial noncompliance has occurred, he shall revoke the permit.  *cf. Heckler*, 470 U.S. at 834 (citing 29 U.S.C. § 482).  It is apparent, from this example, that Congress would be able to set forth criteria or guidelines for the Secretary's investigative, deliberative discretion.  With such constraints in place, courts could meaningfully judge whether the Service has abused its discretion in making enforcement decisions.

the ESA provides no standards to judge whether they have been unlawfully withheld, *see* 5 U.S.C. § 706(1); and, alternatively, the Court cannot hold unlawful and set aside a refusal in that regard as an abuse of discretion because the ESA provides no standard by which to judge such basic investigative and deliberative decisions, *see id.* § 706(2).  In conclusion, the Secretary's refusal or failure to find the County in continuing noncompliance is committed to agency discretion by law and cannot be reviewed under the APA.  *Id.* § 701(a)(2).

This conclusion, however, does not close the book on the sea turtles.  At least in its current form, the 1996 Permit's days are numbered.  In rendering a decision on whether to renew the Permit, the Service will have to determine *inter alia* whether the County "will, to the maximum extent practicable, minimize and mitigate the impacts of [incidental] taking."  *See* 16 U.S.C. 1539(a)(2)(B)(ii).  Furthermore, the Service will have about nine years worth of experience under the Permit and related HCP as well as related public comments to boot.  *See id.*  It is reasonable to expect that experience will inform the Service's decision as to whether the challenged beach activities will "appreciably reduce the likelihood of the survival and recovery of the [listed sea turtle] species in the wild."  *See id.* § 1539(a)(2)(B)(iv).  If the Conservationists are unhappy with the Service's final determination, APA review will, of course, be available.

### 3.      Lack of Environmental Assessments (EAs) and Notice

The Conservationists' final challenge to the 1996 Permit relates to alleged procedural requirements under NEPA.  In Count IV, the Conservationists allege that, since December 31, 2001, the Service has failed to prepare EAs for certain permit amendments and failed to publish Federal Register notice of the availability of EAs.  Apparently, this claim is loosed as a procedural arrow to what the Conservationists see as the 1996 Permit's Achilles heel.

As mentioned near the outset of this analysis, NEPA provides a general mandate that federal agencies address certain environmental impacts before proceeding with "major Federal actions significantly affecting the quality of the human environment." *Sierra Club*, 295 F.3d at 1214 (citing 42 U.S.C. § 4332(2)(C)). Whether a federal action is "major" is an issue taken up by administrative regulations. *See, e.g.*, 40 C.F.R. § 1501.2 (generally advising to "[a]pply NEPA early in the [planning] process"). General regulations, and subsidiary agency procedures tailored to specific agency functions, set forth a framework to decide, at the planning phase, whether NEPA analysis is necessary. *See, e.g.*, 40 C.F.R. § 1501.3; NEPA revised implementing procedures, U.S. Dep't of Interior, 69 Fed. Reg. 10866 (Mar. 8, 2004)("DOI NEPA Procedures"); NEPA revised implementing procedures, U.S. Fish and Wildlife Serv., 62 Fed. Reg. 2375 (Jan. 27, 1997)("Service NEPA Procedures"). One of the earliest regulatory issues posed is whether an agency should prepare an EA, a concise public document discussing whether further NEPA analysis is necessary. 40 C.F.R. 1508.9.

Internal agency guidance is fairly specific as to when an EA should be prepared. Certain actions are presumptively subject to categorical exclusion from NEPA analysis and do not require an EA. DOI NEPA Procedures, 69 Fed. Reg. at 10876. Among these categorical exclusions are "[c]hanges or amendments to an approved action when such changes have no or minor potential environmental impact" and "the issuance of . . . 'low effect' incidental take permits that, individually or cumulatively, have a minor or negligible effect on the species covered in the habitat conservation plan." Service NEPA Procedures, 62 Fed. Reg. at 2381. As a general matter, it is not necessary to prepare an EA in such instances. DOI NEPA procedures, 89 Fed. Reg. at 10876. That is not without exception, however; categorical exceptions only apply "in the absence of

extraordinary circumstances." *Id.*  In relevant part, "[e]xtraordinary circumstances exist for individual actions . . . which may [h]ave significant impacts on [listed] species . . . ." *Id.* at 10878.

In the instant case, the Conservationists' NEPA claims rest on a theory that post-December 31, 2001 amendments to the 1996 Permit and the alleged *de facto* renewal of the 1996 Permit involved "extraordinary circumstances."  Followed to its end, the theory goes something like this: (1) agency actions involved "extraordinary circumstances"; (2) this required the Service publically to report information under NEPA's regulatory procedures; (3) the Service failed to do so; (4) and, accordingly, the actions (or delay) the Service undertook must be set aside as arbitrary or otherwise unlawful under the APA.  With this, the Conservationists challenge the alleged *de facto* permit renewal and four amendments temporarily allowing specific activities in beach zones and purporting to give extended expiration dates to the 1996 Permit.

The Court has already decided issues relevant to the forgoing theory and challenges.  No *de facto* permit renewal has occurred.  And the 1996 Permit remains in effect by virtue of being renewable, by virtue of the Renewal Request, and by regulations that, therefore, hold the Permit's expiration in abeyance.  *See* discussion *supra* Part IV.A.1.

What is apparently left of the Conservationists' NEPA claims are challenges to the Service temporarily allowing specific activities in beach zones.  The last amendment, for instance, allowed limited beach access for heavy equipment to remove, repair, and replace damaged structures and to remove debris during a period from September 23, 2004 to April 30, 2005.[11]  Coincidentally, at the time of this Order, this last amendment has just expired.  As far as the remaining challenges, this presents a problem.

---

[11]This amendment was apparently issued so that hurricane cleanup activities could proceed.

Regardless of whether the amendments are "final agency actions" or involve "agency actions committed to agency discretion by law," the distinct possibility of mootness has arisen. To be sure, the Conservationists may argue that mootness does not arise because the amendments involve wrongs capable of repetition but evading review. *See, e.g., Southern Pac. Terminal Co. v. ICC*, 219 U.S. 498, 514-15 (1911). Nevertheless, the prospect that the amendments involved unique issues imparts substantial concern about the likelihood of repetition as well as concern that the Court might exceed its jurisdiction by giving an advisory opinion. *See generally* Erwin Chemerinski, Federal Jurisdiction §§ 2.5.1, 2.5.3 (4th ed. 2003). One prospect is that the Service may decline to renew the 1996 Permit. Another is that the Service may tailor a renewed permit to cover short-term habitat incursions under specific circumstances. Accordingly, the Court will dismiss, without prejudice, the Conservationists' challenge to the amendments. The Conservationists will have the option to replead the claim when the Service's final decision on renewal is rendered. At that time, the variables influencing the likelihood of repetition will be reasonably established.

### B. ESA Review and the Conservationists' Claim of Unlawful Piping Plover "Taking"

Beyond the Conservationists' claims for APA review, the only remaining claim arises directly under the ESA. In Count I of their Complaint, the Conservationists claim that the County has caused the "take" of piping plovers. This claim is ostensibly viable because the 1996 Permit does not cover the piping plover. If an unauthorized "take" has occurred, the ESA provides a basis for injunctive relief. *See* 16 U.S.C. § 1540(g)(1)(A). As previously indicated, however, the piping plover is not due to return from summering on the Cape and other distant shores until September

2005.  By then or soon after, the Service is expected to render a final permit determination which may include incidental take authorization covering the piping plovers.  In keeping with its stance in 1996, the Service may otherwise omit such authorization on finding no appreciable risk that a take of any piping plover will occur.  But whatever the case, there is no immediate threat of such a take and the attendant prejudice to warrant immediate relief.  The Service, furthermore, is poised to issue a final evaluation of environmental issues that are outside this Court's core competence.  Accordingly, the Court will dismiss this claim in deference to the Service's primary jurisdiction, with the expectation that the Service's action will resolve basic issues or aid the Court in eventually doing so.[12]  *See Smith*, 236 F.3d at 1298 n.3.

## V.    CONCLUSION

As discussed above, the Conservationists' claims fall (or in one instance appear to fall) outside the Court's jurisdiction, are invalid, or should otherwise be dismissed out of deference to the Service's primary jurisdiction.  The Conservationists seem to believe that what is "necessary" for the protection of listed species is procedural quagmires, uncompromising administrative oversight, and scorched-earth litigation throughout.  That is not so, if for no other reason, because Congress has not mandated such an utter waste of resources.  As none of the Service's decisions or deliberations appear to comport with the Conservationists' standards about what is "necessary," it seems appropriate to dispel any notion that the ESA or the APA leave little or no discretion to the Service in that regard.  It is hereby:

---

[12]If the Service fails to render a final permit determination by the start of the piping plovers' overwintering season (September), the Conservationists may refile Count I and seek preliminary injunctive relief, subject to the limitations of Rule 11.

**ORDERED** that the County's Motion to Dismiss is **GRANTED** such that the

Conservationists Amended Complaint (Doc. 44) is dismissed as follows:

- Count I is **DISMISSED** without prejudice, but on condition that it shall not be refiled, if at

  all, until September 1, 2005;

- Counts II and III are **DISMISSED** with prejudice for failure to state a claim upon which

  relief can be granted insofar as they claim that the 1996 Permit has expired, and Counts II

  and III are **DISMISSED** for lack of subject matter jurisdiction insofar as they claim a *de*

  *facto* permit renewal has occurred;

- Count IV is **DISMISSED** without prejudice, but on condition that it shall not be refiled, if

  at all, until September 1, 2005;

- Count V is **DISMISSED** with prejudice for failure to state a claim upon which relief can

  be granted; and

- Count VI is **DISMISSED** for lack of subject matter jurisdiction.

Any other pending motions are **DENIED** as moot, and the Clerk is directed to close the file.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on May 3, 2005.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party

*Amended to remove the language for the clerk to close the file in 20 days and directing clerk to close file immediately.*